# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**American Federation of Government Employees,**
***et al.*,**

            **Plaintiffs,**

**v.**                                          **Case No.  3:03-cv-355**
                                               **Judge Thomas M. Rose**

**David M. Stone,[1] *et al.*,**

            **Defendant.**

---

## ENTRY AND ORDER GRANTING DEFENDANTS LOY AND WILLIAMSON'S MOTION TO DISMISS.  (DOC. 7).

---

This matter is before the Court for decision on Defendants Loy and Williamson's Motion to Dismiss.  Doc. 7.  Therein, Defendants assert that the complaint in this case should be dismissed for lack of subject matter jurisdiction and failure to state a claim, as required by Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).   Plaintiffs are Debra Cummings and the American Federation of Government Employees ("AFGE").   Defendants are the Administrator of the Transportation Safety Administration ("TSA") and Linda J. Williamson, the TSA's Acting Federal Security Director at the Dayton International Airport.  Plaintiffs asserts that Defendants terminated Cummings' employment as a Transportation Security Screener in violation of the United States Constitution.  Defendants challenge AFGE's standing to bring the instant action and further assert

---

[1] While the complaint names James M. Loy as a defendant, Federal Rule of Civil Procedure 25(d) requires that, when a public officer is a party to an action in his official capacity and during its pendency ceases to hold office, the officer's successor is automatically substituted as a party.

that all Defendants are immune from suit.  Because it does not have standing in the instant case, AFGE will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).  Because Defendants are immune from suit, the claims that Cummings brings will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.      Factual Background

In light of the procedural posture of the instant action, the Court will accept as true all facts alleged in the complaint.  The complaint alleges that Plaintiff Debra Cummings began her employment as a TSA Security Screener at the Dayton International Airport on September 15, 2002. Doc. 1, ¶ 7.  According to the TSA's Human Resources Management Policy Manual section "Interim Policy on Probation Periods," Cummings was subject to a one-year probationary period. Doc. 7 ex. 3, ¶ 5(c)(1).  The same policy manual governing probationary periods states that probationary employees, other than screeners, may appeal employment decisions to the Merit Systems Protection Board if they believe the termination was based upon discrimination because of political affiliation or marital status.  *Id* at 5(i).  No such administrative review extended to probationary screeners.

In October 2002, a few weeks into her employment, Cummings requested Sundays off so that she could fulfill her religious obligations by attending church services.  *Id.*, ¶ 8.  On October 28, 2002, the TSA informed Cummings that it would not accommodate her request.  *Id.*  Nevertheless, Cummings raised the issue again the next day with Pete Argent, the Assistant Federal Security Director, who apparently had been in charge of the TSA operation at the Dayton International Airport at some point.  *Id.*  Argent agreed to adjust Cummings' schedule to give her Sundays off. *Id.*  The next day, however, TSA management informed Cummings that Argent had no authority to

give such a directive, asserting he was no longer in charge of the Dayton Airport, and reiterated to her that the TSA would not accommodate the requested religious accommodation. *Id.,* at ¶ 9.

On November 1, 2002, Cummings filed an informal Equal Employment Opportunity complaint pursuant to 29 C.F.R. § 1614. In spite of this, on November 25, 2002, TSA issued Cummings a Certificate of Appreciation for "outstanding performance and perfect attendance." *Id.* ¶ 11. Her perfect attendance would, however, soon end.

In early December, Cummings' son became ill and she was approved four days of sick leave from December 3, 2002 through December 6, 2002 in order to care for him. Two weeks later, Cummings' daughter became ill, necessitating three more days of sick leave: a full day on December 17, and half days on December 18 and 19, when Cummings' husband assisted her in caring for the girl.

About this same time, in December 2002, Transportation Safety Administrator James M. Loy issued guidance to all TSA Federal Security Directors restricting union activity, ordering, "Employees may engage in union activities when they are off-duty, including when they are on breaks, provided that they do not disturb employees who are on duty." *Id.* at 12. Loy's authority in this area was established by the Aviation and Transportation Security Act, which was passed on November 19, 2001. By and large, this act allows TSA employees to form, join and assist labor organizations, and gives most classifications of TSA employees the right to engage in collective bargaining. 49 U.S.C. §§ 114(n), 40122(b)(2)(C); and 5 U.S.C. § 7102(1) & (2). Baggage screeners, however, are excluded from the category of TSA employees allowed union activity: "Notwithstanding any other provision of law, the Under Secretary of Transportation Security may

employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment for Federal service" for federally employed airport screeners.  49 U.S.C. § 44935.

On January 8, 2003, Loy issued another directive, this one prohibiting airport screeners employed by the TSA from engaging in collective bargaining or from being represented for the purpose of engaging in such bargaining by any representative or organization.  *Id.* at 14.  Loy wrote a letter to screeners, however, which emphasized that employees were still free to engage in union organizing activities, as long as they did not do so on work time and did not interfere with security work or otherwise undermine aviation security.  Doc. 7 ex. 2.

AFGE challenged Loy's directive before the Federal Labor Relations Authority ("FLRA").  The FLRA determined that it could not order the TSA to allow an election.  Doc. 7 ex. 9 & 10.  AFGE next challenged this determination in federal court, adding a claim that Loy's decision also violated the United States Constitution.  The district court dismissed the action, and AFGE appealed.  The United States Court of Appeals for the District of Columbia affirmed, noting that the right to engage in collective bargaining was a statutory creation that could be statutorily rescinded, and that, while the union might conceivably someday state a Constitutional claim for chilling associational rights, the Loy directive did not chill the freedom of association, as it allowed the workers to organize, if they so chose.  *American Federation of Government Employees, AFL-CIO v. Loy*, 367 F.3d 932 (D.C. Cir. 2004).

On January 10, 2003, Cummings received an evaluation describing her work performance as still meeting or exceeding the standard for satisfactory performance.  *Id.* ¶ 15.  This was followed by a written statement by then Acting Federal Security Director for the Dayton International Airport

John Thomas that '[i]t is my understanding that [Cummings'] quality of work is acceptable, and I am pleased to have [Cummings] as part of my team." *Id.* at 16.

In late January and February 2003, however, Cummings' children again became sick, this time with influenza. Cummings repeatedly requested sick leave to be with each child as they took ill, and she was approved for three days' leave on January 27, February 3, and February 8, 2003, for a total of nine days. By February 9, 2003, Cummings understandably succumbed to the flu herself, and was approved for three more days of sick leave.

Shortly thereafter, in March 2003, AFGE, the American Federation of Government Employees, Local 1, arrived at the Dayton International Airport to attempt to organize TSA security screeners. Cummings joined in this activity, distributing union materials during her off-duty hours. The complaint alleges that it became common knowledge among TSA management and screeners that Cummings distributed union materials at the airport while off duty. *Id.*, ¶ 19.

This common knowledge did not extend, however, to Screening Supervisor Todd Willoughby. On March 14, 2003, Todd Willoughby questioned security screeners whether they knew which employee was distributing union materials. Willoughby stated that the employee would be fired. Doc. 1, ¶ 20. Neither did Screening Manager Don Bemming share the common knowledge. On March 22, 2003, Bemming also stated that when he learned which employee was distributing union materials, that person would be fired. *Id.* ¶ 21.

In the midst of this, on March 17, 2003, Cummings filed a formal Equal Employment Opportunity complaint alleging that the TSA failed to accommodate the exercise of her religion. Doc. 1 ¶ 23. At the same time, Cummings persisted in distributing union materials while off-duty, averaging four days of such activity a week throughout March and April. In late March, Defendant

Linda Williamson, who had succeeded to the apparently ephemeral office of acting Federal Security Director at the Dayton International Airport, learned that Cummings was distributing union fliers. Doc. 1 at ¶ 25.

On April 17, 2003, Williamson issued to Cummings a document entitled, "Memorandum of Counseling." The memorandum stated that Cummings had been absent from duty approximately 13 days during the past five and one-half months and warned that the continued use of "unscheduled leave" such as sick leave may not be tolerated in the future. The memorandum noted, however, that since it was not a formal disciplinary action, it would not be placed in Cummings' official personnel file and could not be grieved . Doc. 1 ¶ 26.

Nine days later, on April 26, 2003, the event which Defendants contend precipitated Cummings' termination transpired. Cummings was working at the Dayton Airport security checkpoint when an AirTran pilot walked through the metal detector at which Cummings was stationed. The AirTran pilot walked through the detector with his wrists concealing his belt area. Cummings considered the pilot's hand position inconsistent with the TSA Standard Operating Procedure § 4.1.1-G. Cummings therefore ordered the pilot to proceed to the secondary screening area for further screening pursuant to another Standard Operating Procedure. Cummings repeated the request three times before the pilot complied. Doc. 1 ¶ 27.

On June 12, 2003, Cummings was terminated from employment, nine months into her one-year probationary period. Doc. 1 ¶ 28. The letter to Cummings stated:

> On September 15, 2002, the Transportation Security Administration (TSA) hired you as a Transportation Security Screener (SV-0019-D) in the excepted service. Your appointment is subject to completion of a one-year probationary period. Employees may be terminated during their probationary period because their work performance or conduct fails to demonstrate their fitness or qualifications for

-6-

continued employment. I have decided to terminate your TSA employment. Your termination will be effective close of business on the date you receive this notice.

On April 26, 2003, you were involved in a disturbance with an Air Tran Captain as the Captain attempted to clear security at the passenger walk[-]through metal detectors. You indicated that you believed the Captain had walked through the metal detectors "too quickly", although he had not alarmed. You, then in a rude and harsh voice, told him, "... you know better than that." Instead of sending him through the detector a second time, as he requested, you ordered him into the secondary screening area. A review of the surveillance video tape did not indicate that the Captain had gone through the metal detector at a pace any different than other individuals.

In reviewing your prior discipline record it is noted that on the same day, April 26, 2003, you were issued a Memorandum of Counseling regarding your poor attendance record. It is additionally noted that you have been rude and argumentative with members of management, including the FSD, in meetings held to address concerns you have raised on a variety of topics. Your disrespectful tone and confrontational behavior does not meet the standards of the TSA.

* * *

Because you are serving a probationary period, there are no appeal or grievance procedures available with respect to your termination. If you believe this termination resulted from discrimination or harassment based on race, color, religion, sex, national origin, physical or mental disability, age (40 or over), sexual orientation, or reprisal, you may contact the Office of Civil Rights (1-877-336-4872). If you choose to contact the Office of Civil Rights you must do so within 45 calendar days of the effective date of this action.

Doc. 7, ex. 4.

On October 17, 2003, Plaintiffs filed a complaint in this Court alleging violations of Cummings' First Amendment rights. Plaintiffs named two defendants: James M. Loy, who was then the Administrator of the Transportation Security Administration, in his official capacity, and the then acting Federal Security Director for the TSA at the Dayton International Airport, Linda Williamson,

in both official and individual capacities. Defendants have now moved the Court to dismiss Plaintiffs' action pursuant to Federal Rule of Civil Procedure 12(b)(a) and (6). Doc. 7.

## II. Standards of Review

In reviewing a Rule 12(b)(1) motion, the plaintiff has the burden of proving jurisdiction to survive the motion and the Court has the power to resolve factual disputes. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986). "The established rule is that a plaintiff, suing in a federal court, must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Smith v. McCullough*, 270 U.S. 456, 459, 46 S. Ct. 338, 339 (1926). Allegations which are the essence of jurisdiction are essential and can neither be overlooked nor supplied by inference. *Dodrill v. New York Central Railroad Company*, 253 F. Supp. 564, 567 (S.D. Ohio 1966). Nevertheless, amendments to defective allegations of jurisdiction are broadly permitted so as to avoid dismissal on technical grounds. *Miller v. Davis*, 507 F.2d 308 (6th Cir. 1974); 28 U.S.C. § 1653.

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the complaint. When considering a motion to dismiss pursuant to Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S. Ct. 609, 614 (1972). Although the Court must liberally construe the complaint in favor of the party opposing the motion to dismiss, *Kugler v. Helfant*, 421 U.S. 117, 125-26 n.5, 95 S. Ct.

1524, 1531 n.5 (1975), it will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *Blackburn v. Fisk Univ.*, 443 F.2d 121, 124 (6th Cir. 1971); *Sexton v. Barry*, 233 F.2d 220, 223 (6th Cir. 1956).  The Court will, however, indulge all reasonable inferences that might be drawn from the pleading. *Fitzke v. Shappell*, 468 F.2d 1072, 1076-77 n.6 (6th Cir. 1972).

The Court is mindful that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).  See also *McLain v. Real Estate Bd.*, 444 U.S. 232, 246, 100 S. Ct. 502, 511 (1980); *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983).  Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983); *Sims v. Mercy Hosp.*, 451 F.2d 171, 173 (6th Cir. 1971), the focus is on whether the plaintiff is entitled to offer evidence to support the claims, rather than on whether the plaintiff will ultimately prevail. *Scheuer*, 416 U.S. at 236, 94 S. Ct. at 1686; *McDaniel v. Rhodes*, 512 F. Supp. 117, 120 (S.D. Ohio 1981).

A complaint need not set down in detail all the particularities of a plaintiff's claim against a defendant. *United States v. School District of Ferndale*, 577 F.2d 1339, 1345 (6th Cir. 1978). Federal Rule of Civil Procedure 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  However, a complaint must afford the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. See *Dunn*, 697 F.2d at 125; *Westlake*, 537 F.2d at 858.  Thus, this Court will grant a motion for dismissal under Rule 12(b)(6) if there is an absence of law to support a claim of the type alleged, if the facts alleged

are insufficient to make a valid claim, or if on the face of the complaint there is an insurmountable

bar to relief indicating that the plaintiff does not have a claim.  See *Rauch v. Day & Night Mfg.*, 576

F.2d 697, 702 (6th Cir. 1978); *Brennan v. Rhodes*, 423 F.2d 706 (6th Cir. 1970).

## III.    Analysis

The motion is actually contained in two parts: a first that seeks to dismiss AFGE for lack of

standing, and a second to dismiss Cummings' claims.  Since the challenge to AFGE's standing

relates to the Court's jurisdiction, it must be considered first.  *Sault Ste. Marie Tribe of Chippewa*

*Indians v. United States*, 9 Fed. Appx. 457, 460 (6th Cir. 2001) (citing *Steel Company v. Citizens*

*for a Better Environment*, 523 U.S. 83, 118 S. Ct. 1003 (1998)).

## A.    Standing of AFGE

Defendants' motion to dismiss AFGE for lack of standing asserts that AFGE has not been

elected by the employees of the TSA at the Dayton International Airport and that the "suit is about

Plaintiff Cummings' individual rights, as opposed to any rights of the Union."  Doc. 7 at 2.

"[F]ederal courts, being courts of limited jurisdiction, must examine their subject-matter jurisdiction

throughout the pendency of *every* matter before them."  *Children's Healthcare is a Legal Duty, Inc.*

*v. Deters*, 92 F.3d 1412, 1419 (6th Cir. 1996) (citations omitted; emphasis in original).  Article III

of the Constitution limits the federal court jurisdiction to "Cases" and "Controversies":

> thereby entailing as an "irreducible minimum" that there be (1) an
> injury in fact, (2) a causal relationship between the injury and the
> challenged conduct, and (3) a likelihood that the injury will be
> redressed by a favorable decision.  See, *e.g.*, *Northeastern Fla.*
> *Chapter, Associated Gen. Contractors of America v. Jacksonville*,
> 508 U.S. 656, 663, 113 S. Ct. 2297, 2301-02 (1993); *Valley Forge*
> *Christian College v. Americans United for Separation of Church and*
> *State, Inc.*, 454 U.S. 464, 472, 102 S. Ct. 752, 758-59 (1982).
> Supplementing these constitutional requirements, the prudential
> doctrine of standing has come to encompass "several judicially

self-imposed limits on the exercise of federal jurisdiction." See *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 3324 (1984); see also *Flast v. Cohen*, 392 U.S. 83, 97, 88 S. Ct. 1942, 1951 (1968).

*United Food and Commercial Workers Union, Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551, 116 S. Ct. 1529, 1533 (1996). The existence of the associational standing upon which organizations such as unions rely, is determined by use of a three-prong test:

> [W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).

As regards the first prong, it suffices for the union to have standing if any of its members have standing. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211-12 (1975) ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit…."). While Defendants pointed out that it was not alleged that Cummings was a member of AFGE, Doc. 7 at 8 (citing complaint), Plaintiffs allege in their response that Cummings is an activist and member of AFGE Local 1. Doc. 9, at 6.

The union prevails on the second prong as well. The interests it seeks to protect are germane to the organization's purpose: the union exists to protect its members' workplace rights, and Cummings asserts she was fired for exercising her workplace rights. The third prong, however, is the union's stumbling block.

The instant case is a quintessential example of a case where "the nature of the claim and of the relief sought…make[s] the individual participation of each injured party indispensable to proper resolution of the cause…." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211-12, 45 L. Ed.2d 343 (1975).  If the union sought to bring the instant cased without Cummings' participation, she would be deemed an indispensable party, as the matter could not be resolved without resolving her alleged harm.  Fed. R. Civ. P. 19.  Therefore, AFGE does not have standing and will be dismissed.

### B.     Defendants Sued in Official Capacity

Defendants urge the Court to dismiss all claims against individuals in their official capacity. "[A]ctions against parties in their official capacities are, essentially, actions against the entities for which the officers are agents." *Littlejohn v. Rose*, 768 F.2d 765, 772 (6th Cir. 1985).  Thus, insofar as a complaint decries alleged actions by federal employees as agents of the United States, it effectively presents a claim only against the United States itself.  See *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989).  The claims against Williams and Loy in their official capacities will thus be considered claims against the United States.

"It is well settled that the United States as a sovereign is immune from suit unless it expressly waived such immunity and that the bar of sovereign immunity cannot be avoided simply by naming officers and employees of the United States as defendants." *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 115 (6th Cir.1988).  Plaintiff counters the case law limiting her ability to sue defendants in their official capacity with an assertion that sovereign immunity does not protect the federal government from injunctive relief ordering back pay or declaratory relief.  Doc. 9, at 10. The case law on the availability of injunctive relief against the United States overlaps with that

governing Defendants' request that the Court dismiss Plaintiff's *Bivens* claims, and they will therefore be analyzed together below.

**C.  *Bivens* Claims**

In *Bivens v. Six Unknown Named Agents of the Federal Narcotics Bureau*, 403 U.S. 388, 91 S. Ct. 1999 (1971), the Supreme Court held that federal officers who acted under color of law were liable for damages caused by their violations of a plaintiff's Fourth Amendment rights. *Bivens*, 403 U.S. at 389, 397, 91 S.Ct. at 2001, 2005. The *Bivens* cause of action was created in the Fourth Amendment context, however, due the absence of "special factors counseling hesitation in the absence of affirmative action by Congress...." *Id.* at 396, 91 S. Ct. at 2004 (internal quotations and citation omitted). Without such prudential concerns, the rule that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, courts may use any available remedy to make good the wrong done" prevailed. *Id.*

Since *Bivens*, however, the Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky*, 487 U.S. 412, 421, 108 S.Ct. 2460, 2466 (1988). One area where the Supreme Court has hesitated has been in employment cases where an administrative remedy has been established. In this case, the Court must consider whether Plaintiff can sustain a *Bivens* action injuries resulting from her allegedly unconstitutional termination.

In the employment context, the notion of recognizing a *Bivens* action for unconstitutional actions runs counter to the preclusive effect the Supreme Court has recognized in the Civil Service Reform Act of 1978 (CSRA), Pub. L. 95-454, 92 Stat. 1111 *et seq.* (codified, as amended, in various sections of 5 U.S.C. (1982 ed. and Supp. IV)). See *United States v. Fausto*, 484 U.S. 439, 445, 108

S. Ct. 668, 672 (1988). "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action[s], which had been part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." *Fausto*, 484 U.S. at 445, 108 S. Ct. at 672 (citing S. Rep. No. 95-969, p. 3 (1978), U.S. Code Cong. & Admin. News 1978, p. 2723). Among the items composing the "haphazard" "outdated patchwork" were injunctive relief and declaratory judgment actions in district courts. *Id.* The Court went on, albeit in *dicta*, to directly assert that the CSRA preempts equitable actions brought by probationary employees concerning claims arising out of federal employment actions, even though probationary employees are in a category of employees who are excluded from the CSRA's remedies. The Court did this while rejecting the arguments of the respondent, a non-preferred executive service employee, as undoing the uniformity the CSRA sought to create allowing greater rights for non-CSRA covered employees:

> Under respondent's view, he would be able to obtain judicial review of a 10-day suspension for misconduct, even though a competitive service employee would not, since Chapter 75 makes MSPB review, and hence judicial review, generally unavailable for minor adverse personnel action, including suspensions of less than 14 days. *Moreover, this inverted preference shown to nonpreference excepted service employees would be shown as well to probationary employees, another disfavored class.* See 5 U.S.C. § 4303(f)(2) (expressly excluding probationary employees from review under Chapter 43); § 7511(a)(1)(A) (expressly excluding probationary employees from Chapter 75); S. Rep. No. 95-969, at 45, U.S.Code Cong. & Admin.News 1978, p. 2767 ("It is inappropriate to restrict an agency's authority to separate an employee who does not perform acceptably during the [probationary period]"). Since probationary employees, like nonpreference excepted service employees, are excluded from the definition of "employee" for purposes of Chapter 75 [of the CSRA], respondent's theory that persons so excluded retain their pre-CSRA remedies must apply to them as well.

*Fausto*, 484 U.S. at 450, 108 S. Ct. at 675 (emphasis added).  The Supreme Court rejected this theory, and this Court will as well.

Another argument Cummings puts forward is that she can maintain an action under the APA. The Sixth Circuit has stated that the APA establishes procedures for maintaining an administrative action, not a cause of action:

> Appellant contends that the district court had subject matter jurisdiction under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq.  This contention is without merit.  It is now well settled that "the APA is not to be interpreted as an implied grant of subject-matter jurisdiction...." *Califano v. Sanders*, 430 U.S. 99, 105 (1977). The APA cannot supply subject matter jurisdiction; "it only prescribes the standards for reviewing agency action once jurisdiction is otherwise established." *Staacke v. Secretary of Labor*, 841 F.2d 278, 282 (9th Cir.1988). Therefore, the district court correctly held that it did not have jurisdiction under the APA.

*Resci v. Veterans Admin. Medical Center*, 876 F.2d 104, 1989 WL 62520  (6th Cir. 1989). A footnote to this unpublished opinion addresses Cummings' APA argument in the *Bivens* context even more directly:

A footnote from a Sixth Circuit opinion addresses Plaintiff's claim even more directly:

> Appellant also relies on *Gleason v. Malcom*, 718 F.2d 1044, 1048 (11th Cir. 1983), a *Bivens* action which stated in dicta that a discharged federal employee "could have sought equitable relief ... pursuant to the Administrative Procedure Act."  However, this is not a holding that the APA provides district court jurisdiction in such cases.  The APA governs procedures; it does not supply jurisdiction" *Id.* n.1  (citing *Califano*, 430 U.S. at 107).  See also *Springs v. Stone*, 362 F. Supp. 2d 686, 69 -98 (E.D. Va. 2005).

*Resci*, 876 F.2d 104, 1989 WL 62520, *2 n.1.

Finally, Cummings draws the Court's attention to the Sixth Circuit case of *Booher v. United States Postal Service*, 843 F.2d 943, 945-46 (6th Cir. 1988).  *Booher* does state, as Plaintiff asserts

that "'a probationary employee may be discharged for any reason, or for no reason at all, but not for an unconstitutional reason.'"  *Id.* at 945-46 (quoting *Kotarski v. Cooper*, 799 F.2d 1342, 1347 (9th Cir. 1986) (Kotarski I ), vacated and remanded, 487 U.S. 1212, 108 S. Ct. 286 (1988)).  This statement in *Booher* is deceptive, as *Booher* declined to follow *Kotarski* and *Kotarski*, for its part, is no longer good law even in the Ninth Circuit.  In *Booher*, the Sixth Circuit affirmed dismissal of the plaintiff's claims of Constitutional violation of due process and equal protection, relying in part on the then-recent *Fausto* case, Cummings seeks the opposite result.  *Booher*, 842 F.2d at 946.

The Ninth Circuit better describes the shortcomings of relying upon its *Kotarski* decision:

> Before *Chilicky*, this court permitted a *Bivens* action by a federal employee who was demoted during a promotional probationary period, where the demotion allegedly violated the employee's constitutional rights of privacy and free speech. See *Kotarski v. Cooper*, 799 F.2d 1342, 1344-45 (9th Cir. 1986) (Kotarski I ), vacated and remanded, 487 U.S. 1212, 108 S.Ct. 2861, 101 L. Ed.2d 897 (1988).  In holding that the doctrine of *Bush v. Lucas* did not preclude Kotarski's *Bivens* claim, we emphasized the absence of "meaningful" and "adequate" remedies in the CSRA for probationary employees.  *Id.* 487 U.S. at 1346-49.  The Supreme Court vacated and remanded *Kotarski I* for our reconsideration in light of *Chilicky*. 487 U.S. 1212, 108 S. Ct. 2861.  On remand, we shifted our inquiry from evaluating whether the CSRA provided Kotarski with meaningful and adequate remedies to deciding if the CSRA's omission of a damages remedy for demoted probationary employees was "inadvertent."  See *Kotarski v. Cooper*, 866 F.2d 311, 312 (9th Cir. 1989) *(Kotarski II )*.  Because the CSRA allowed employees to appeal some adverse personnel actions, we found no inadvertence.  We held that "no Bivens action can be implied for Kotarski in light of *Chilicky*."  *Id.*

*Saul v. United States*, 928 F.2d 829, 836-37 (9th Cir. 1991).  The Sixth Circuit has ruled that the comprehensive administrative remedies available under both the CSRA preclude a Bivens action, *Jones v. Tennessee Valley Authority*, 948 F.2d 258, 262 (6th Cir. 1991), and this court sees no reason

to believe that it would not extend that holding to probationary employees. Therefore, Plaintiff's claims against the Defendants in their individual capacity will be dismissed.

**IV.     Conclusion**

Because AFGE has no standing, it is **DISMISSED**. Because Cummings' sole remedies for any unlawfulness in her termination are those created by the Civil Service Reform Act, Cummings' claims are **DISMISSED**. Defendants Loy and Williamson's Motion to Dismiss, doc. 7, is **GRANTED**. The Clerk is to lift the stay in the instant case and instructed to **TERMINATE** the instant matter from the docket of the United States District Court for the Southern District of Ohio at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, Wednesday, July 6, 2005.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE